**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **FERNANDO MORALES,** | § | |
| **INDIVIDUALLY AND ON BEHALF OF** | § | |
| **HIS MINOR CHILDREN, F.M. AND D.M.;** | § | |
| **AND ZIRENIA CARDOZA, IN HER** | § | |
| **INDIVIDUAL CAPACITY,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **No. EP-19-CV-00217-PRM-ATB** |
| | § | |
| **ENRIQUE CARRILLO, AARON** | § | |
| **CARRILLO, PETE HERRERA, GABRIEL** | § | |
| **LECHUGA, RUBEN CARDENAS,** | § | |
| **MIGUEL CARZOLI,  CITY OF EL PASO,** | § | |
| **TEXAS, EL PASO POLICE** | § | |
| **DEPARTMENT, JUAN FERREL, GREG** | § | |
| **ALLEN,** | § | |
| **Defendants.** | § | |

## REPORT AND RECOMMENDATION
## OF THE MAGISTRATE JUDGE

On this day, the Court considered the following submissions filed in the above-captioned

cause:

- "Defendant Sergeant Gabriel Lechuga's Rule 12(b)(6) Motion to Dismiss" (ECF No. 13)

    ("Lechuga's Motion"), filed by Defendant Gabriel[1] Lechuga ("Lechuga") on November 1,

    2019;

- "Defendant Sergeant Ruben Cardenas' Rule 12(b)(6) Motion to Dismiss" (ECF No. 14)

    ("Cardenas's Motion"), filed by Defendant Ruben Cardenas ("Cardenas") on November 1,

    2019;

---

[1] Lechuga's Motion states that it is filed by Defendant "Gilbert" Lechuga.  (ECF No. 13, p. 1).  The title of the Motion, the case caption, and Lechuga's Reply use the first name "Gabriel" and the Court will do the same.

- "Defendant Sergeant Enrique Carrillo's Rule 12(b)(6) Motion to Dismiss (ECF No. 15) ("E. Carrillo's Motion"), filed by Defendant Enrique Carrillo ("E. Carrillo") on November 4, 2019;

- "Defendant Aaron Carrillo's Rule 12(b)(6) Motion to Dismiss" (ECF No. 16) ("A. Carrillo's Motion"), filed by Defendant Aaron Carrillo ("A. Carrillo") on November 4, 2019;

- "City of El Paso's Rule 12 Motions to Dismiss and Brief in Support" (ECF No. 17) ("City's Motion"), filed by the City of El Paso ("City") and on behalf of the El Paso Police Department ("EPPD") and the EPPD Chief of Police Greg Allen ("Chief Allen") (collectively "City Defendants") on November 4, 2019;

- "Defendant Officer Miguel Carzoli's Rule 12(b)(6) Motion to Dismiss Plaintiffs' Amended Complaint and Demand for Jury Trial" (ECF No. 39) ("Carzoli's Motion"), filed by Defendant Miguel Carzoli ("Carzoli") on December 20, 2019;

- "Defendant Officer Juan Ferrel's Rule 12(b)(6) Motion to Dismiss Plaintiffs' Amended Complaint and Demand for Jury Trial" (ECF No. 40) ("Ferrel's Motion"), filed by Defendant Juan Ferrel ("Ferrel") on December 20, 2019;

- "Plaintiffs' Combined Response to all Defendants' Motions to Dismiss" (ECF No. 48) ("Response"), filed by all Plaintiffs on April 3, 2020;

- "Defendant Officer Miguel Carzoli's Reply in Support of his Motion to Dismiss Plaintiffs' Amended Complaint" (ECF No. 54) ("Carzoli's Reply"), filed by Carzoli on April 15, 2020;

- "Defendant Officer Juan Ferrel's Reply in Support of his Motion to Dismiss Plaintiffs' Amended Complaint" (ECF No. 55) ("Ferrel's Reply"), filed by Ferrel on April 15, 2020;

- "Defendant Sergeant Gabriel Lechuga's Reply to Plaintiff's' Response to Lechuga's Rule 12(b)(6) Motion to Dismiss" (ECF No. 57) ("Lechuga's Reply"), filed by Lechuga on April 15, 2020;

- "Defendant Sergeant Ruben Cardenas' Reply to Plaintiffs' Response to Cardenas' Rule 12(b)(6) Motion to Dismiss" (ECF No. 58) ("Cardenas's Reply"), filed by Cardenas on April 15, 2020; and

- "Defendant Sergeant Enrique Carrillo's Reply to Plaintiff's [sic] Response to Rule 12(b)(6) Motion to Dismiss" (ECF No. 59) ("E. Carrillo's Reply"), filed by E. Carrillo on April 15, 2020.[2]

These submissions were referred to this Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 1(d) of Appendix C of the Local Court Rules for a Report and Recommendation on April 29, 2020, by United States District Judge Philip R. Martinez.  (ECF No. 62).

For the reasons set forth below, the Court **RECOMMENDS** that:

- Lechuga's Motion be **GRANTED**;

- Cardenas's Motion be **DENIED**;

- E. Carrillo's Motion be **DENIED**;

- A. Carrillo's Motion be **DENIED**;

- The City Defendants' Motion be **GRANTED**;

- Carzoli's Motion be **GRANTED**; and

- Ferrel's Motion be **GRANTED**;

---

[2] The City Defendants and A. Carrillo did not file replies.

# I.   BACKGROUND[3]

### a.   Factual Background

On July 1, 2019, Plaintiffs Fernando Morales ("Morales"), individually and on behalf of his minor children F.M. and D.M., and Zirenia Cardoza ("Cardoza") (collectively "Plaintiffs"), filed their "Plaintiff's [sic] Original Petition" in County Court at Law 6 in El Paso County, Texas. (ECF No. 1-2, p. 4-34).  On July 16, 2019, the Plaintiffs filed their "Plaintiff's [sic] First Amended Original Petition" in County Court at Law 6.  (*Id.* at 35-65).  On August 9, 2020, the action was removed to the El Paso Division of the United States District Court for the Western District of Texas.  (ECF No. 1).  On October 21, 2019, the Plaintiffs filed their "Plaintiffs' Amended Complaint and Jury Demand" (ECF No. 11) ("Amended Complaint").  The Defendants then filed their respective motions seeking dismissal of the Amended Complaint.

In the Amended Complaint, the Plaintiffs allege that on July 1, 2017, while Morales, Cardoza, and their minor children F.M. and D.M. were traveling in Morales's Ford truck in a Walmart parking lot, a car driven by Defendant E. Carrillo "turned left in front of the Ford pickup, requiring Mr. Morales to stop suddenly."[4]  (ECF No. 11, p. 3-4).  Defendant A. Carrillo was in the passenger seat of the vehicle being driven by E. Carrillo.  (*Id.*).  The Plaintiffs further contend that after passing their vehicle, E. Carrillo "flipped off" Morales and that a collision between the two vehicles "was avoided only by the prompt reaction of Mr. Morales."  (*Id.* at 4).  Both vehicles then parked, with Morales exiting his truck and walking over to the other vehicle to speak briefly with E. Carrillo.  (*Id.*).

---

[3] While recounting the factual background, the Court addresses only the facts relevant to the immediate Report and Recommendation.

[4] The Amended Complaint also contends that two other women who are not plaintiffs in this action were also in the vehicle.  (ECF No. 11, p. 3).

As Morales began to turn back to his truck, A. Carrillo exited the vehicle and grabbed Morales from behind, placing Morales in a "Rear Naked Choke Hold." (*Id.*). While A. Carrillo was grabbing Morales from behind, E. Carrillo "exited the driver's side door of his vehicle and attacked Mr. Morales from the front." (*Id.*). The Carrillos pushed and dragged Morales in the direction of his truck, where they "took [Morales] down to the pavement." (*Id.*).

While the Carrillos "had Mr. Morales sandwiched between them, with Mr. Morales facing upward . . . Enrique Carrillo began pounding on Mr. Morales' face with his clenched fist, leading not with his knuckles but with a striking surface composed of his entire wrist and curled little finger, so that the hand became a hammer." (*Id.*). As Morales began to lose consciousness, E. Carrillo continued striking him until E. Carrillo was stopped by an Immigration and Customs Enforcement agent bystander. (*Id.* at 5). As a result of the altercation, Morales suffered a broken right eye socket, bruises, abrasions, and at least one laceration to his face and chin. (*Id.*). Morales would also experience "chronic painful headaches and significant loss of vision in his right eye" because of his injuries. (*Id.*). Further, Cardoza and the two minor children witnessed the altercation and experienced "bystander trauma." (*Id.*).

After Morales began "to regain his faculties[,]" he got up and "noticed that Enrique and Aaron Carrillo both appeared to be laughing . . . ." (*Id.*). Morales then "bec[a]me angry" and tried "to get to Aaron Carrillo, but Enrique Carrillo knocked [Morales] down from his blind side."

Off-duty EPPD Officer Pete Herrera  ("Herrera") called 911 to report the altercation and then told the 911 operator that the altercation seemed to be breaking up and that no police assistance was necessary. As the 911 operator was informing Herrera that police had already been dispatched, he stated "it's Kiki from Pio . . . ." (*Id.*). Plaintiffs contend that this statement is a

reference to E. Carrillo because he "works at the Police Department Public Information Office." (*Id.*).  Herrera then hung up.[5]  (*Id.*).

The first police officer to respond to the incident at Walmart was Julio Guereca ("Guereca").  (*Id.* at 6).  When Guereca arrived, he advised the Carrillos to stay where they were and then began speaking to Morales about the altercation, taking handwritten notes.  (*Id.*).  While Morales was speaking with Guereca, Cardenas arrived at the Walmart store.  (*Id.*).

Prior to exiting his patrol car, Cardenas began talking to, and laughing with, the Carrillos through the window of his patrol car.  (*Id.*).  Cardenas then walked over to Morales and began "yelling at him words to the effect that he was under arrest for causing a motor vehicle collision." (*Id.*).  Guereca was told by Cardenas "that he could throw away the piece of paper he was taking notes on because he did not need any of the information since the decision had already been made to arrest Mr. Morales." (*Id.*).  Guereca followed this instruction from Cardenas, "crumpling up the paper on which he had been writing and sticking it into his pocket." (*Id.*).  "Guereca then handcuffed Mr. Morales and walked him to the back seat of a patrol car, where Mr. Morales was directed to remain seated." (*Id.*).  While Morales was in the patrol car, he observed Cardenas, E. Carrillo, and A. Carrillo hugging, patting each other on the back, and laughing.  (*Id.* at 7).

Cardoza then attempted to speak with Cardenas, "but he told [Cardoza that] he would not speak to her until he wanted to do so." (*Id.*).  When Cardenas did speak to Cardoza, he "argu[ed] with her about her defense of her husband and attempt[ed] to get information that he could use against Mr. Morales." (*Id.*).  After Cardenas threatened to have Cardoza arrested for outstanding traffic warrants if she did not cooperate with him, Cardoza still refused to cooperate.  (*Id.*). Cardenas then "told another officer to arrest her on th[o]se traffic warrants . . . ."[6]  (*Id.*).

---

[5] Herrera has been dismissed as a defendant in this action.  (ECF No. 64).
[6] The Amended Complaint does not identify which officer arrested Cardoza.

While Morales was in the patrol car, EMS personnel arrived and "attempted to talk to Mr. Morales through a closed window of the patrol car." (*Id.*). Cardenas then "told the EMS personnel that Mr. Morales did not need their help, that he was under their care[,] . . . and that [the EMS personnel] could leave. (*Id.*). After the EMS personnel left, Fire Department personnel arrived and "Cardenas also told [the Fire Department personnel] that they could go[,] and that Mr. Morales was under the care of the Police Department." (*Id.* at 7-8).

Shortly thereafter, Cardenas "approached the patrol car where Mr. Morales was being held and advised Mr. Morales that he was also being arrested for driving while intoxicated." (*Id.* at 8). Cardenas then directed Lechuga to take Morales to a Las Palmas medical facility for treatment of Morales's chin, "which was bleeding profusely." (*Id.*). During the drive to the Las Palmas facility, Lechuga and Morales spoke about the injuries, and then Morales admitted "to having consumed three beers over the course of the afternoon."[7] (*Id.*).

During the course of the investigation in the Walmart parking lot, Lechuga "was tasked to view the video surveillance tapes of the parking lot. He did so with the store manager." (*Id.* at 8). The video of the altercation ("Video") was "fragmentary and partially obscured" but it "show[ed] that no more than ten seconds elapsed between Mr. Morales' arrival at the driver's side of [E. Carrillo's] Nissan and the takedown by Aaron Carrillo." (*Id.* at 4).

Upon his arrival at Las Palmas, "Morales was administered an MRI by the medical staff and allowed to clean the blood on his face." (*Id.* at 9). The MRI showed that Morales had a broken right eye socket. (*Id.*). While at the Las Palmas facility, Morales received stitches for his chin and a "nurse drew blood from Mr. Morales, assuming [his] permission for purposes of medical treatment." (*Id.*). Carzoli and Ferrel then arrived at the Las Palmas facility, relieved Lechuga, and

---

[7] Plaintiffs contend in the Amended Complaint that the statement was made during a custodial interrogation and that Morales was not advised of his *Miranda* rights. (ECF No. 11, p. 8).

"retrieved the bag with the blood the nurse had drawn . . . ."[8]  (*Id.*).  Morales contends that he did not "give his consent to the police to withdraw the blood [and a] person or persons unknown forged [Morales's] signature to a consent form."  (*Id.*).  Morales further contends that in addition to having his rights violated because of the unlawful search and seizure related to the blood draw, Carzoli and Ferrel "violated his rights under the Texas Code of Criminal Procedure by not taking him before a magistrate for a probable cause hearing" after his arrest in the Walmart parking lot.  (*Id.*).

The Plaintiffs allege that Cardenas made the decision to arrest Morales shortly after arriving to the Walmart parking lot without "ask[ing] the Carrillos why the supposedly guilty party showed such obvious, severe injuries while the supposed victim had none."  (*Id.* at 10).  Further, the Plaintiffs allege that Cardenas directed Guereca not to investigate and watched as Guereca tampered with evidence under Texas law by crumpling the page of the notepad on which he was taking notes and placing it in his pocket.  (*Id.*).

Several hours after the altercation, E. Carrillo and A. Carrillo gave written statements to police detectives.  (*Id.*).  The Plaintiffs assert that the statements "were self-serving and false, accusing Mr. Morales of fault in the near collision and about a series of acts they claim occurred between Mr. Morales' arrival at the Carrillo vehicle . . ." and the start of the physical altercation.  (*Id.*).  Plaintiffs contend that the time between the start of the conversation between E. Carrillo and Morales and the start of the physical altercation shows that "[i]t was and is impossible for all things the Carrillos said to have happened in such a short period of time."  (*Id.*).  Based upon this contention about timing, the Plaintiffs allege that E. Carrillo, A. Carrillo, and Cardenas "knowingly imposed false charges, supported by perjurious testimony, against Mr. Morales in order to protect . . . the Carrillos."  (*Id.*).

---

[8] The Amended Complaint does not specifically allege whether it was Carzoli or Ferrel who retrieved the bag of blood.

Morales was confined for three days on the assault charge. (*Id.*). On June 27, 2018, Morales was acquitted by a jury of the assault charge. (*Id.*). Shortly after the acquittal, Morales was indicted for felony DWI. (*Id.*). The Plaintiffs contend that the felony DWI prosecution is "an apparent retaliation for his defense of himself in the assault trial." (*Id.*).

### b.   Legal Claims

First, Plaintiffs seek to bring a claim ("Claim One") for "Excessive Force During Arrest" against E. Carrillo and A. Carrillo under 42 U.S.C. § 1983. Plaintiffs contend that in the written statement given by E. Carrillo, he "falsely and perjuriously accused Mr. Morales of striking him on the left side of his face." (*Id.* at 11). Despite contending that this statement is false, Plaintiffs assert that were it true, "then [E. Carrillo] would have had the power and the duty to arrest Mr. Morales for assault causing bodily harm." (*Id.*). Based upon this power, the Plaintiffs contend that E. Carrillo "was acting within the course and scope of his employment as an El Paso police officer when he used force against Mr. Morales." (*Id.*). Further, A. Carrillo "would have had the right to assist [E. Carrillo]." (*Id.*). The Plaintiffs contend that the Carrillos "used unreasonable, unnecessary, and excessive force during the arrest of Mr. Morales[, which] . . . caused the injuries . . . and the damages . . . alleged." (*Id.*).

Second, the Plaintiffs seek to bring a claim ("Claim Two") for the "Imposition of False Charges, Plus Perjured Testimony." (*Id.* at 12). The Amended Complaint does not identify which defendants the claim is brought against. However, based upon the claims and factual allegations contained in the Amended Complaint, it appears to be asserted against all of the defendants except the City Defendants. The Plaintiffs contend that E. Carrillo "deliberately lied in order to get Mr. Morales charged to cover up [Morales's] own unlawful use of force." (*Id.*). Further "[t]hrough [E. Carrillo's] influence over his fellow officers, he was able to enlist successfully all of the other

named individual Defendants to conspire, combine, confederate, and agree among themselves to a course of action pursuant to which Mr. Morales was seized and arrested, incarcerated for three days, and brought to trial on perjured testimony." (*Id.*). The Plaintiffs allege that this conduct violated Morales's rights under the Fourteenth Amendment and seek to bring the claim pursuant to 42 U.S.C. § 1983. (*Id.*).

Third, Plaintiffs seek to bring a claim ("Claim Three") under "Texas Common Law [for] Infliction of Bodily Injury." (*Id.*). In the Amended Complaint, Plaintiffs allege that E. Carrillo and A. Carrillo "are liable to [Morales] for making physical contact with him . . . ." (*Id.*).

Fourth, Plaintiffs seek to bring a "Texas Common Law Bystander Claim" ("Claim Four") based upon Cardoza, F.M., and D.M. "observ[ing] the beating." (*Id.*). The Amended Complaint does not identify which defendants this claim is brought against. However, because this claim only references the physical altercation, this bystander claim appears to be brought solely against E. Carrillo and A. Carrillo.

Fifth and finally, Plaintiffs seek to bring a claim for municipal liability ("Claim Five") against the City Defendants. (*Id.* at 13). In their Amended Complaint, Plaintiffs contend "that a police officers' Code of Silence, with toleration of misconduct, is a widespread practice that is so common and well settled as to constitute a custom that fairly represents municipal policy." (*Id.*). Further, Plaintiffs argue that this custom "was the moving force behind Mr. Morales' injuries, false charges and perjured testimony brought against him, and the resulting damages he has sustained."

## II.   LEGAL STANDARD

### a.   Federal Rule of Civil Procedure 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint when a defendant shows that the plaintiff has failed to state a claim upon which relief can be

granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The factual matter contained in the complaint must allege actual facts, not legal conclusions masquerading as facts. *Id.* (citing *Twombly*, 550 U.S. at 555) ("Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'").

To resolve a Rule 12(b)(6) motion, courts must determine "whether in the light most favorable to the plaintiff and with every doubt resolved on his behalf, the complaint states any valid claim for relief." *Gregson v. Zurich Am. Ins. Co.*, 322 F.3d 883, 885 (5th Cir. 2003) (citation omitted). A complaint states a "plausible claim for relief" when the factual allegations contained therein infer actual misconduct on the part of the defendant, not a "mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. The complaint "'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

**b.** **Qualified Immunity**

Qualified immunity protects "'state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Jackson v. City of Hearne, et al.*, 959 F.3d 194, 200 (5th Cir. 2020) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "'To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. In other words, existing precedent must have

placed the statutory or constitutional question beyond debate.'"  *Id.* (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

"The plaintiff has the burden of establishing a constitutional violation and overcoming a [qualified immunity] defense."  *Id.* (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam)).  To meet this burden, "the plaintiff 'must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a [qualified immunity] defense with equal specificity.'"  *Id.* (quoting *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012)).

### c.  Title 42 U.S.C. Section 1983 Conspiracy

"A conspiracy may be charged under section 1983 as the legal mechanism through which to impose liability on all of the defendants without regard to who committed the particular act." *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995).  "Plaintiffs who assert conspiracy claims under civil rights statutes must plead the operative facts upon which their claim is based. Bald allegations that a conspiracy existed are insufficient."  *Lynch v. Cannatella*, 810 F.2d 1363, 1369–70 (5th Cir. 1987).  Further, "[t]he plaintiff must not only allege facts that establish (1) the existence of a conspiracy involving state action, but also (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy.  No deprivation, no § 1983 conspiracy."  *Shaw v. Villanueva*, 918 F.3d 414, 419 (5th Cir. 2019) (internal quotation marks and citations omitted).

However, "when each state action alleged to have harmed the plaintiffs [is] determined to be qualifiedly immune, there [is] no need to reach the issue of whether a conspiracy existed to engage in those actions."  *Hale*, 920–21 (citing *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187-88 (5th Cir. 1990)); *see Walker v. Stroman*, No. 1-17-CV-00372-ADA, 2020 WL 2114387, at *6

(W.D. Tex. May 4, 2020) ("Because the Court has already found that the Plaintiff failed to overcome Defendants' qualified immunity, the conspiracy claim is not actionable.").

### d.   Municipal Liability

Municipalities cannot be held liable under 42 U.S.C. § 1983 based upon a theory of vicarious liability.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id.*; *see Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009) ("[A municipality] is liable only for acts directly attributable to it 'through some [sort of] official action or imprimatur.'") (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).  Municipal liability is "limited to acts that are, properly speaking, acts 'of the municipality' – that is, acts which the municipality has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

Under Section 1983, municipal liability for a policy or custom claim requires proof of:  (1) a policymaker; (2) an official policy or custom; and (3) a violation of constitutional rights of which the "moving force" is the official policy or custom.  *Piotrowski*, 237 F.3d at 578.  Furthermore, only where a municipality adopts a policy that violates a constitutional right or fails to adopt a policy preventing the violation of a constitutional right "evidenc[ing] a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a [municipal] 'policy or custom' that is actionable under § 1983."  *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Therefore, to establish municipal liability, a plaintiff must establish both municipal causation and culpability.  *See Snyder v. Trepagnier*, 142 F.3d 791, 795–96 (5th Cir. 1998) ("Plaintiffs seeking to win under this theory must first prove a direct causal link between the municipal policy and the

constitutional deprivation; they then must establish that the city consciously enacted a policy reflecting 'deliberate indifference' to the constitutional rights of its citizens.").

There are multiple ways in which a custom or policy can be found to exist.  First, a custom or policy can stem from a single act by an official with final policymaking authority.  *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986) (establishing that isolated actions or decisions by a municipal policymaker with "final policymaking authority" may create municipal liability).  Second, the custom or policy can also be a policy statement formally announced by an official policymaker.  *See Zarnow v. City of Wichita Falls*, 614 F.3d 161, 168 (5th Cir. 2010) (citing *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc) (per curiam)).  Finally, a custom or policy can also be demonstrated through a "persistent[,] widespread practice of [municipal] officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Id.*; *see Webster*, 735 F.2d at 841).  "For a custom or practice to be considered a de facto policy, however, a plaintiff must allege facts 'showing a pattern of abuses that transcends the error made in a single case.'" *Lozano v. Ortega*, No. EP-14-CV-239-KC, 2014 WL 6611595, at *15 (W.D. Tex. Nov. 19, 2014) (quoting *Piotrowski*, 237 F.3d at 582).  "[I]solated unconstitutional actions by municipal employees will almost never trigger liability." *Piotrowski* 237 F.3d at 578.

## III.   ANALYSIS

With the exception of E. Carrillo, A. Carrillo, and the City Defendants, the only claim brought against any of the other defendants is Claim Two for the conspiracy to violate Morales's constitutional rights.  Further, all of the defendants except for A. Carrillo and the City Defendants have raised the defense of qualified immunity.

    **a.**    **E. Carrillo's Motion**

In his Motion, E. Carrillo contends that Claim One and Claim Two should be dismissed.[9]

    1.    Claim One – Excessive Force

For Claim One, E. Carrillo contends that "Plaintiffs have failed to allege sufficient facts or allegations that the amount of force used was clearly excessive or sufficiently disproportionate to the need presented not that it was objectively unreasonable under the circumstances." (ECF No. 15, p. 4). E. Carrillo further contends that he is entitled to qualified immunity for the excessive force claim. (*Id.* at 5). In response, the Plaintiffs contend that they have "described in detail facts and allegations that the force was clearly excessive and grossly disproportionate to a comment which took less than five seconds to deliver." (ECF No. 48, p. 11). Further, the Plaintiffs argue that "[s]ince at least 2008, it has been clearly established that pushing, kneeing, and slapping a suspect who is neither fleeing nor resisting is excessive." (*Id.* at 10).

"Section 1983 provides a claim against anyone who under color of any statute, ordinance, regulation, custom, or usage, of any State violates another's constitutional rights." *Bustos v. Martini Club Inc.*, 599 F.3d 458, 464 (5th Cir. 2010) (internal quotation marks omitted). "Whether an officer is acting under color of state law does not depend on his on- or off-duty status at the time of the alleged violation." *Id.* (citing *United States v. Tarpley*, 945 F.2d 806, 809 (5th Cir. 1991)). When determining if someone was acting under color of law, "the court must consider: (1) whether the officer 'misuse[d] or abuse[d] his official power,' and (2) if 'there is a nexus between the victim, the improper conduct, and [the officer's] performance of official duties.'" *Id.* at 465-66 (alterations in original) (quoting *Townsend v. Moya*, 291 F.3d 859, 861 (5th Cir. 2002)).

---

[9] E. Carrillo's Motion does not address Claim Three or Claim Four. Further, E. Carrillo specifically requests only "that the allegations in Count 1 and Count 2 of Plaintiffs' Amended Complaint be dismissed . . . ." (ECF No. 15, p. 9).

Further, when "an officer pursues personal objectives without using his official power as a means to achieve his private aim, he has not acted under color of state law." *Id.* at 465.

Both the Plaintiffs and E. Carrillo agree that he was acting within the course and scope of his official duties.  In their Amended Complaint, Plaintiffs allege that "[a]s a City police officer, Defendant Enrique Carrillo was considered to be on duty at all times, with full power and duty to arrest anyone whom he saw committing an offense."  (ECF No. 11, p. 11).  Further, Plaintiffs allege that E. Carrillo "falsely and perjuriously accused Mr. Morales of striking him on the left side of his face."  (*Id.*).  Based upon these claims, Plaintiffs contend that "Enrique Carrillo was acting within the course and scope of his employment as an El Paso police officer when he used force against Mr. Morales.  (*Id.*).  E. Carrillo agrees with Plaintiffs contention and affirmatively argues that he was acting within the course and scope of his official duties.  First, E. Carrillo argues that "[r]egardless of whether Sgt. Carrillo was the official 'arresting officer', Sgt. Carrillo's actions were within the course and scope of his official duties.   Per Plaintiff's Complaint, Plaintiffs state that Sgt. Carrillo was considered to be on duty at all times, with full power and duty to arrest anyone whom he saw committing an offense."  (ECF No. 59, p. 2) (citing (ECF No. 11, p. 11)). E. Carrillo then asserts that the Plaintiffs have failed to overcome his qualified immunity defense and that "Sgt. Carrillo's actions were taken within the course and scope of his official duties, pursuant to clearly established law in existence at the time, and without specific malicious intent." (*Id.*).  Accordingly, Plaintiffs have alleged, and E. Carrillo agrees, that he was acting within the course of scope of his official duties.

An excessive force claim requires that the "plaintiff must allege: (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need, and (3) the use of force that was objectively unreasonable." *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008).  The

injury "is generally legally cognizable when it results from a degree of force that is constitutionally impermissible—that is, objectively unreasonable under the circumstances." *Id.* "In evaluating excessive force claims, courts may look to the seriousness of the injury to determine whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Brown v. Lippard*, 472 F.3d 384, 386–87 (5th Cir. 2006) (internal quotation marks omitted). "The objective reasonableness of the force . . . depends on the facts and circumstances of the particular case, such that the need for force determines how much force is constitutionally permissible." *Bush*, 513 F.3d at 501. In assessing the objective reasonableness, a "court should consider 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Accepting the facts alleged in the Amended Complaint as true,[10] the Court finds that the Plaintiffs have alleged an excessive force claim against E. Carrillo. To satisfy the injury requirement, the Plaintiffs contend that Morales suffered a broken right eye socket, bruises, abrasions, and at least one laceration to his face and chin. (ECF No. 11, p. 5). These injuries satisfy the injury requirement. *See Bush*, 513 F.3d at 501 ("Bush sustained injuries to her face, teeth, and jaw.").

Further, the extent of the injuries alleged suggests that the amount of force used was beyond what plausibly could have been thought to have been necessary. *See Brown*, 472 F.3d at 386-87. In assessing whether the force applied was excessive and objectively unreasonable, a court is directed to  consider "the severity of the crime at issue, whether the suspect poses an immediate

---

[10] *Bell*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678.

threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Bush*, 513 F.3d at 501  After careful consideration of these factors, the Court finds that Plaintiffs have alleged facts sufficient to demonstrate that the use of force was objectively unreasonable.

First, accepting the facts alleged in the Amended Complaint as true,[11] there does not appear to have been any crime at issue *when the altercation occurred*.  The crime at issue dictates the necessity for and permissible amount of force.  In *Deville v. Marcantel*, the Plaintiff "was stopped for a minor traffic violation . . . making the need for force substantially lower than if she had been suspected of a serious crime."  567 F.3d 156, 167 (5th Cir. 2009).   Similarly, in *Peña v. City of Rio Grande*, the Fifth Circuit held that "Peña's allegations against the officers survive[d] Rule 12(b)(6) not because she was running but because she was a *non-threatening non-suspect*.  A felon in flight presents another matter entirely."  879 F.3d 613, 622 (5th Cir. 2018) (emphasis in original).

The Plaintiffs contend that after Morales "spoke briefly with Enrique Carrillo" Morales was beginning "to turn back toward where his truck was parked" when he was grabbed from behind by A. Carrillo.  (ECF No. 11, p. 4).  While A. Carrillo held Morales from behind, E. Carrillo "attacked Mr. Morales from the front."  (*Id.*).  As a result of the incident, Morales faced or is currently facing charges for assault and driving while intoxicated.  (*Id.* at 10).  Neither of these charges are implicated in the events leading up to the altercation, as alleged in the Amended Complaint.  Further, Plaintiffs contend in their Amended Complaint that A. Carrillo initiated the physical altercation by grabbing Morales from behind, and E. Carrillo continued the physical altercation by striking Morales.  (*Id.* at 4).  According to the Amended Complaint, the first physical

---

[11] *Bell*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678.

contact was A. Carrillo grabbing Morales from behind.  (*Id.* at 4).  Similarly, the first reference to driving while intoxicated or the consumption of alcohol in the Amended Complaint is when Cardenas told "Morales that he was also being arrested for driving while intoxicated," long after the physical altercation had ended.  (*Id.* at 8).  Accordingly, this consideration weighs heavily in favor of Morales.

Second, accepting the facts alleged in the Amended Complaint as true, it does not appear that Morales was a threat to the safety of anyone else at the time the altercation began.  Morales alleges that he was beginning "to turn back toward where his truck was parked" when he was grabbed from behind by A. Carrillo.  (ECF No. 11, p. 4).  Further, Morales contends that he merely "spoke with Enrique Carrillo briefly."  (*Id.*).  E. Carrillo contends that his "actions were taken directly in response to the aggressive action of Plaintiff Morales."  (ECF No. 15, p. 5).  However, Morales denies "striking [E. Carrillo] on the left side of his face."  (ECF No. 11, p. 11).  Accordingly, the Court finds that this consideration weighs in favor of Morales.

Finally, accepting the facts alleged in the Amended Complaint as true, Morales does not appear to have been attempting to resist arrest or avoid arrest by flight.  In *Bush*, the Fifth Circuit held "that it was objectively unreasonable for an officer to slam an arrestee's face into a vehicle when the arrestee 'was not resisting arrest or attempting to flee.'"  *Amador v. Vasquez*, --- F.3d ---, 2020 WL 2900759, at *6 (5th Cir. June 3, 2020) (quoting *Bush*, 513 F.3d at 502).  In the Amended Complaint, Plaintiffs contend that Morales was "helpless . . . throughout the unprovoked attack."[12]  (*Id.* at 5).  Further, despite beginning to "los[e] consciousness, Enrique Carrillo

---

[12] In their Response, Plaintiffs allege that "[t]he only eyewitness . . . testified at Mr. Morales' trial that [Morales] never threw a single punch and that the Carrillos were the aggressors from start to finish."  (ECF No. 48, p. 5).  This specific factual allegation does not appear anywhere in the Amended Complaint.  In considering a Federal Rule of Civil Procedure 12(b)(6) Motion to Dismiss, the Court can only consider "the contents of the pleadings, including attachments thereto."  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).  Therefore, the Court will not consider this contention.  Plaintiffs also seek to allege numerous other facts not found in their Amended Complaint.  Accordingly, the Court will not consider any of the allegations found in the Response but not alleged in

continued his hammer-fisted attack" until the Carrillos were "induced . . . to stop their assault" by a bystander.  (*Id.*).  Because the facts alleged in the Amended Complaint demonstrate that Morales was not resisting arrest or attempting to flee, this consideration weighs in favor of Morales.

Accordingly, accepting the facts alleged in the Amended Complaint as true, the Court finds that the Plaintiffs have alleged that the amount of force used against Morales by E. Carrillo was excessive to the needs of the situation and objectively unreasonable.

Successfully overcoming a claim of qualified immunity requires that the plaintiff allege both a violation of a constitutional right and that "the right was clearly established at the time of the challenged conduct."  *Jackson*, 959 F.3d at 200 (5th Cir. 2020) (internal quotation marks omitted).

In *Bush*, the Fifth Circuit held that "the law was clearly established that although the right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it, the permissible degree of force depends on the severity of the crime at issue, whether the suspect posed a threat to the officer's safety, and whether the suspect was resisting arrest or attempting to flee."  513 F.3d at 502 (5th Cir. 2008) (internal quotation marks omitted).  Further, the defendant "should have known that he could not forcefully slam [the plaintiff's] face into a vehicle while she was restrained and subdued."  *Id.*  Similarly, the Fifth Circuit allowed an excessive force claim to proceed when the plaintiff alleged that despite being "a non-threatening non-suspect[,]" police officers tased her. *Peña*, 879 F.3d at 622 (emphasis omitted).  In the Amended Complaint, the Plaintiffs allege that E. Carrillo continued striking Morales, even as Morales began to lose consciousness.  (ECF No. 11, p. 5).  Further, the Plaintiffs contend that the Carrillos initiated the physical altercation.  (*Id.* at 4).

---

the Amended Complaint, including Section II(D) "Other Post-Amendment Evidence" and Section III(B) paragraph 24 (ECF No. 48, p. 5-6, 9-10).

Accordingly, the Court finds that it was clearly established that E. Carrillo could not use the amount of force he is alleged to have used against Morales when Morales was not a threat to others, was not attempting to resist arrest, and when there does not appear to have been a crime Morales was suspected of committing at the time the force was used against him.  Therefore, the Court finds that the Plaintiffs have alleged facts sufficient to overcome E. Carrillo's defense of qualified immunity and the Plaintiffs have stated a claim against E. Carrillo.

  2.  Count Two – Conspiracy

In his Motion, E. Carrillo asserts three grounds for the dismissal of Count Two.  First, he contends that the Plaintiffs' conspiracy claims are vague and conclusory.  (*Id.* at 7).  Second,  E. Carrillo also argues that the Plaintiffs have failed to state a claim for false arrest against him because he was not involved in Morales's arrest and, therefore, "Plaintiffs are unable to allege sufficient facts to state a claim for relief 'for false arrest.'"  (*Id.* at 9).  Further "even if Sgt. Carrillo were deemed to be involved in the arrest of Plaintiff Morales, Plaintiffs' claims for false arrest would still fail, as that arrest was supported by probable cause" because "Morales was taken to a magistrate judge for a probable cause hearing."  (*Id.*).  Third, E. Carrillo contends that he "is entitled to dismissal of the conspiracy and/or false arrest claims against him based upon qualified immunity."  (*Id.*).

  A.  Conspiracy

Accepting the facts alleged in the Amended Complaint as true,[13] the Court finds that the Plaintiffs have alleged specific facts which permit the reasonable inference that A. Carrillo and E. Carrillo conspired and formed an agreement prior to the physical altercation with Morales.  First, Plaintiffs have alleged that EPPD Sgt. E. Carrillo's actions were within the scope and course of

---

[13] *Bell*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678.

his employment.  (ECF No. 11, p. 11).  Further, when the traffic incident occurred and the vehicles were parking, A. Carrillo was in the vehicle with his father, E. Carrillo.  (*Id.* at 4).  Next, while Morales and E. Carrillo were briefly speaking, A. Carrillo had already exited the vehicle and "was running at [Morales] from behind."  (*Id.* at 4).  Then, "[a]lmost simultaneously" with A. Carrillo "grab[bing] Mr. Morales and placing him in a 'Rear Naked Choke Hold,'"  E. Carrillo "exited the driver's side door of his vehicle and attacked Mr. Morales from the front."  (*Id.*).  The Carrillos then "pushed and dragged Mr. Morales for about the length of their car in the direction of the Morales vehicle" before Morales was taken "down to the pavement."  (*Id.*).  While Morales was "sandwiched between" the Carrillos, E. Carrillo "began pounding on Mr. Morales' face."  (*Id.*).  Even while Morales "began losing consciousness" E. Carrillo "continued his hammer fisted attack, which only ended when a bystander . . . induced the Carrillos to stop their assault."  (*Id.*).  These actions taken by A. Carrillo and E. Carrillo, done in concert, suggest a conspiracy to respond with force to Morales.

The Court further finds that that Plaintiffs have alleged facts from which it can be inferred that E. Carrillo and Cardenas formed a conspiracy when Cardenas's arrived at the Walmart parking lot.[14]  The Plaintiffs allege that E. Carrillo was the one to "enlist successfully all of the other named individual Defendants . . . ." (ECF No. 11, p. 12).  Further, when Cardenas arrived at the Walmart, he "stopp[ed] first where the Carrillos were standing."  (ECF No. 11, p. 6).  Then, "[a]fter th[e] brief conversation with the Carrillos, Sgt. Cardenas walked over to Mr. Morales, yelling at him words to the effect that he was under arrest for causing a motor vehicle collision."  (*Id.*).  After informing Morales that he was under arrest, Cardenas told "Guereca that he could throw away the

---

[14] The Plaintiffs are not clear in their Amended Complaint if this conspiracy was an extension of the prior agreement between A. Carrillo and E. Carrillo or if this conspiracy was a separate and distinct agreement between the Carrillos and Cardenas.

piece of paper [Guereca] was taking notes on because he did not need any of the information since the decision had already been made to arrest Mr. Morales." (*Id.*).  After speaking to several bystanders, Cardenas then returned to the Carrillos, shaking hands and laughing.  (*Id.* at 7).  When Cardenas spoke to Cardoza, he "attempt[ed] to get information that he could use against Mr. Morales."  (*Id.*).  When Cardoza refused to cooperate, Cardenas had "another officer . . . arrest [Cardoza] on [outstanding] traffic warrants."  (ECF No. 11, p. 7).  When EMS arrived at the Walmart and began attempting to speak with Morales, Cardenas stopped them.  (*Id.*).

Accordingly, the Court finds that the Plaintiffs have alleged facts from which it can be inferred that there were conspiracies involving E. Carrillo, A. Carrillo, and Cardenas.

Additionally, the Plaintiffs allege that there was a conspiracy involving E. Carrillo and all of the other individually named defendants.  While the Plaintiffs do not allege in their Amended Complaint that E. Carrillo was involved in the arrest of Morales, they allege that Cardenas made his decision to arrest Morales after he spoke with the Carrillos.[15]  (*Id.* at 6).  A conspiracy claim brought under Section 1983 requires an actual deprivation of a constitutional right.  *Shaw*, 918 F.3d at 419.  Further, a conspiracy claim "impose[s] liability on all of the defendants without regard to who committed the particular act."  *Hale*, 45 F.3d at 920.  Even if E. Carrillo was not involved in the actual arrest, he could still have the claim brought against him if it is determined that there was a constitutional deprivation committed by one of the participants in the conspiracy.

B.      Probable Cause for the Arrest

E. Carrillo further argues that even if he were deemed to have been involved in the arrest, a claim against him for false arrest would still fail because a magistrate found that there was

---

[15] Plaintiffs do not make a specific allegation in their Amended Complaint about what was said between the Carrillos and Cardenas during this conversation, although the Plaintiffs do allege that the Carrillos and Cardenas "were all laughing."  (ECF No. 11, p. 6).

probable cause for the arrest.  However, in the Amended Complaint, the Plaintiffs specifically allege that Morales was not taken "before a magistrate for a probable cause hearing."  (ECF No. 11, p. 9).  Accepting this assertion as true,[16] E. Carrillo's cannot rely on Morales's appearance before a magistrate to establish probable cause.[17]  Further, E. Carrillo does not address any facts contained in the Amended Complaint that would support probable cause for the arrest of Morales.  *See Pfannstiel*, 918 F.2d at 1184.  Accordingly, the Court finds that E. Carrillo cannot defeat the false arrest allegation by relying on his contention that Morales was taken before a magistrate.

C.    Qualified Immunity for the Arrest

Finally, E. Carrillo contends that the conspiracy and false arrest claim against him should be dismissed based upon his qualified immunity.  (ECF No. 15, p. 9).  In their Amended Complaint, the Plaintiffs contend that E. Carrillo made written false statements after the physical altercation.  (ECF No. 11, p. 10).  However, there is no allegation contained in the Amended Complaint about how those allegedly false statements may have been used against Morales.  Further, Morales was already under arrest at Cardenas's direction when the allegedly false statements were made.  *See* (*Id.* at 7) (stating that Morales was arrested in the Walmart parking lot).  While the Plaintiffs contend that Morales was "brought to trial on perjured testimony" (*Id.* at 12), they do not identify who committed perjury or what statements were made.  Finally, the Plaintiffs do not identify what federal right of Morales was violated by the allegedly false statements E. Carrillo made to the police detectives.  Accordingly, the Court finds that E. Carrillo is entitled to qualified immunity for the allegations made against him in the context of the false arrest conspiracy claim.[18]  However,

---

[16] *Bell*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678.

[17] When considering the instant motions, the Court must accept as true Morales's contention that he was not taken before a magistrate for a probable cause hearing.  Factual development of the claim may, of course, alter the analysis during later proceedings.

[18] This conclusion does not affect the conclusion above in Section III(a)(1) that E. Carrillo is not entitled to qualified immunity for the Plaintiffs' excessive force claim, as alleged in the Amended Complaint.

it is only if each action attributed to all of the alleged members of the conspiracy is determined to be qualifiedly immune that the conspiracy claim fails.  *See Hale*, 45 F.3d at 920 ("when each state action alleged to have harmed the plaintiffs [is] determined to be qualifiedly immune, there [is] no need to reach the issue of whether a conspiracy existed to engage in those actions.").   Therefore, the conspiracy claim against E. Carrillo survives if any of the members of the conspiracy are not entitled to qualified immunity.

### b.  A. Carrillo's Motion

In his Motion, A. Carrillo argues that "Plaintiffs have failed to state a claim on Counts 1 [Excessive Force During Arrest] and 2 [Imposition of False Charges, Plus Perjured Testimony] of the [Amended] Complaint against [A.] Carrillo upon which relief may be granted.  Accordingly, Plaintiffs' claims in Counts 1 and 2 against [A.] Carrillo must be dismissed."  (ECF No. 16, p. 3). In their Response, Plaintiffs contend that "[i]t is undisputed that [A. Carrillo] came to the aid of his father, a state actor, who was attempting to carry out an arrest."  (ECF No. 48, p. 11).

Plaintiffs do not allege that A. Carrillo was a state actor at the time of the altercation.  "For a private citizen . . . to be held liable under section 1983, the plaintiff must allege that the citizen conspired with or acted in concert with state actors."  *Priester v. Lowndes Cty.*, 354 F.3d 414, 420 (5th Cir. 2004).  The Fifth Circuit "has held that a non-state actor may be liable under [§] 1983 if the private citizen was a 'willful participant in joint activity with the State or its agents.'"  *Id.* (quoting *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994)).  "The plaintiff must allege: (1) an agreement between the private and public defendants to commit an illegal act and (2) a deprivation of constitutional rights.  Allegations that are merely conclusory, without reference to specific facts, will not suffice."  *Id.* (Internal citation omitted).  "A plaintiff must 'allege specific facts to show an agreement.'"  *Tebo v. Tebo*, 550 F.3d 492, 496 (5th Cir. 2008) (quoting *Priester*, 354 F.3d at

420).  These facts must be "specific, nonconclusory facts that establish that there was an agreement among the defendants to violate his federal civil rights." *Montgomery v. Walton*, 759 F. App'x 312, 314 (5th Cir. 2019).  "The plaintiff, however, may and often must rely on circumstantial evidence and reasonable inferences therefrom, since conspiracies are rarely evidenced by explicit agreements." *Way v. Mueller Brass Co.*, 840 F.2d 303, 308 (5th Cir. 1988) (internal quotation marks omitted).

A. Carrillo denies that he is a state actor and contends that he "is not subject to suit in a Section 1983 case." (ECF No. 16, p. 4).  In support, A. Carrillo argues that "Plaintiffs make no allegations that Carrillo was a state actor working under color of state law such that his conduct may be fairly attributed to the state.  Plaintiffs do not provide any factual allegations to state that [A.] Carrillo's conduct was in performance of a public function or the result of state compulsion or coercion." (*Id.* at 5).  A. Carrillo further argues that "Plaintiffs also fail to show that there was an agreement to commit an illegal act and a deprivation of constitutional rights.  As such, Plaintiffs' claims against Carrillo for excessive force must be dismissed." (*Id.* at 5).  In their Response, the Plaintiffs contend that "[i]t is undisputed that he came to the aid of his father, a state actor, who was attempting to carry out an arrest." (ECF No. 48, p. 11).

Further, the Plaintiffs' Amended Complaint alleges specific facts from which it can be reasonably inferred that A. Carrillo was a willing participant in an agreement with a state actor, sufficient to bring a Section 1983 claim against him.  In *Way v. Mueller Brass Co.*, the Fifth Circuit held that the facts alleged, accepted as true, "constitute[d the] 'operative facts' that, if further developed, would permit a reasonable inference that" the defendants had conspired to violate the plaintiff's civil rights.  840 F.2d 303, 308 (5th Cir. 1988).  The facts alleged in *Way* showed that:

> (1) [the plaintiff] was qualified for employment at Mueller Brass but was not hired, although sixteen males were hired; (2) [the plaintiff] was not hired because she was

> not referred by the State Commission; (3) the Commission did not refer her because [Defendant] Mueller had told the Commission it did not want any women; and (4) at the EEOC hearing, [Defendant] Riley, the Commission's employee, falsely denied having admitted to Way that the reason she was not referred was that Mueller did not want any women.

*Id.* The *Way* Court then held that "[t]he conspiracy claims against Mueller therefore should not have been dismissed." *Id.*

As addressed above in Section III(a)(2), the Plaintiffs have alleged facts from which it can be inferred that A. Carrillo and E. Carrillo formed a conspiracy.  In their Amended Complaint, the Plaintiffs allege that while together in E. Carrillo's vehicle, A. Carrillo and E. Carrillo acted together to grab, drag, and restrain Morales.  (ECF No. 11, p. 3-6).  Accordingly, even though A. Carrillo was not a state actor, the Court finds that a Section 1983 claim can be brought against him based upon his actions and the alleged conspiracy with his father, E. Carrillo.

A. Carrillo further contends that the Plaintiffs "have provided no allegations that the actions taken by [A.] Carrillo were excessive or that [A.] Carrillo had any reason to believe that his conduct was unreasonable under the circumstances." (ECF No. 16, p. 5).  Just as with E. Carrillo, the force alleged to have been used against Morales was excessive based upon the facts alleged in the Amended Complaint.[19]  First, none of the charges Morales alleges that he has faced or is facing were implicated prior to the time the first physical contact occurred when A. Carrillo grabbed Morales from behind and then dragged him, holding him there so that E. Carrillo could strike him to the point of near unconsciousness.  Second, there is no indication from the facts alleged in the Amended Complaint that Morales was a danger to anyone else.  Finally, there is no indication that Morales was attempting to flee or to resist arrest at the time the altercation began.

---

[19] As the Court has already addressed the factors to be considered in determining the objective reasonableness of the force employed above in section III(a)(1), the Court will only briefly summarize the analysis.

Accordingly, the Court finds that the force used against Morales by the Carrillos when Morales was not suspected of any crime was objectively unreasonable.[20]  Accepting as true the Plaintiffs' contention that the Carrillos initiated the physical altercation, A. Carrillo grabbed Morales from behind.  (ECF No. 11, p. 4).  The Carrillos then pushed and dragged Morales until bringing him to the ground.  (*Id.*).  Morales was then "sandwiched" between the Carrillos while E. Carrillo struck him, even as Morales "began to lose consciousness."  (*Id.* at 4-5).  Further, A. Carrillo initially grabbed Morales in a "maneuver designed to cut off not just breathing, but also blood supply to the brain, causing loss of consciousness." (*Id.* at 4).  As the Plaintiffs have alleged that E. Carrillo was acting in his official capacity when the altercation between the Carrillos and Morales occurred, the Court finds that Plaintiffs have stated an excessive force claim against A. Carrillo under section 1983 and, therefore, A. Carrillo's Motion should be denied.

### c.    Ruben Cardenas's Motion

In his Motion, Cardenas argues that "dismissal is warranted based upon insufficient factual allegations."  (ECF No. 14, p. 4).  Cardenas further argues that "the conspiracy and/or false arrest claim should be dismissed based upon Sergeant Cardenas [sic] qualified immunity."  (ECF No. 14, p. 5).

### 1.    The Conspiracy Claim

For the reasons set forth more fully in Section III(a)(2) above, the Court finds that the Plaintiffs have alleged facts from which a conspiracy involving Cardenas can be inferred.  In their Amended Complaint, the Plaintiffs allege that the first people Cardenas spoke to upon his arrival in the Walmart parking lot was the Carrillos.  (ECF No. 11, p. 6).  Cardenas then immediately

---

[20] The Plaintiffs allege that Cardenas informed Morales that he was being arrested for causing a "motor vehicle collision."  (ECF No. 11, p. 6).  However, the Plaintiffs contend that no collision occurred because of "the prompt reaction of Mr. Morales."  (*Id.* at 4).

informed Morales that he was under arrest. (*Id.*). Subsequently, Cardenas had Guereca stop interviewing Morales and destroy the notes Guereca has been taking. (*Id.*). Accepting these factual contentions as true, the Court finds that the Plaintiffs have alleged specific facts from which it can be inferred that Cardenas and the Carrillos were involved in the same conspiracy.

     2.     Qualified Immunity

Plaintiffs contend that Morales's constitutional rights were violated through the imposition of false charges. (ECF No. 11, p. 12). The Plaintiffs are clear in the Amended Complaint that it was Cardenas who made the decision to arrest Morales. (ECF No. 11, p. 10) ("Cardenas announced *his* decision to arrest Mr. Morales . . . .") (emphasis added). This claim against Cardenas appears to be premised on a theory of false arrest.

     A.     Federal Right

"A constitutional claim for false arrest . . . 'requires a showing of no probable cause.'" *Arizmendi v. Gabbert*, 919 F.3d 891, 897 (5th Cir. 2019), cert. denied, 140 S. Ct. 220 (2019) (quoting *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009)). "Probable cause is established by 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Id.* (quoting *Hilton*, 568 F.3d at 204). "This probable cause may be for any crime and is not limited to the crime that the officers subjectively considered at the time they perform an arrest." *Hilton*, 586 F.3d at 204. However, "[t]he facts must be known to the officer at the time of the arrest; post-hoc justifications based on facts later learned cannot support an earlier arrest." *Id.*

Cardenas argues that the relevant inquiry is "whether the officers had probable cause to arrest the Plaintiff for assault, not whether the Plaintiff actually instigated the assault." (*Id.* at 6).

Cardenas further contends that "the magistrate's finding [of probable cause] broke the chain of causation insulating Sergeant Cardenas from liability." (*Id.*).  However, Morales contends that he was not taken before a magistrate after his arrest.  Accepting this contention as true,[21] the Court finds that Cardenas cannot defeat the claim asserted against him solely by relying on his contention that Morales was taken before a magistrate.[22]  *See Pfannstiel*, 918 F.2d at 1184.

Cardenas relies entirely on the disputed contention that Morales was taken before a magistrate to establish that probable cause existed to arrest Morales.  Further, Cardenas's Motion does not identify any facts alleged in the Amended Complaint that would establish "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Arizmendi*, 919 F.3d at 897 (internal quotation marks omitted).

The Plaintiffs contend in their Amended Complaint that the Carrillos initiated the physical altercation.  (ECF No. 11, p. 4).  Further, Morales contends that he was helpless during the entire physical altercation and that while he sustained severe injuries, the Carrillos sustained none.  (*Id.* at 10).  Additionally, as addressed above in Section III(a)(1), at the time that the physical altercation began, there appears to have been no reason, based upon the facts as alleged in the Amended Complaint, for Morales to have been suspected of causing a motor vehicle collision.  Finally, the first reference in the Amended Complaint to driving while intoxicated was when Cardenas informed Morales that "he was also being arrested for driving while intoxicated." (*Id.*

---

[21] *Bell*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678.
[22] The Amended Complaint makes clear that it was Ferrel and Carzoli who allegedly did not take Morales before a magistrate.  Therefore, to the extent that Morales is asserting a violation of his rights because he claims that he was not taken before a magistrate, the Court will address this specific allegation in the discussion about the acts attributed to Ferrel and Carzoli.

at 8).  This statement was allegedly made after Cardenas had already announced his decision to

arrest Morales.  However, the first indication in the Amended Complaint that Morales had been

drinking was Morales's admission to Lechuga that he had consumed several beers over the course

of the afternoon.  This admission occurred long after the arrest had been made, while Morales was

being transported to the Las Palmas medical facility for medical treatment.  Based upon the facts

as alleged in the Amended Complaint, the facts alleged to have been known to Cardenas at the

time of the arrest would not support probable cause to arrest Morales for driving while intoxicated

at that time because there was no prior indication that Morales had drank anything until he was on

his way to the Las Palmas facility with Lechuga.  Even if probable cause to arrest Morales for

driving while intoxicated were to arise after he was arrested, that would be insufficient because

"[t]he facts must be known to the officer at the time of the arrest; post-hoc justifications based on

facts later learned cannot support an earlier arrest."  *Hilton*, 586 F.3d at 204.  Accepting these facts

alleged in the Amended Complaint as true, and because Cardenas has relied solely on Morales's

disputed appearance before a magistrate to support his contention that there was probable cause at

the time of arrest, the Court finds that there was no probable cause for Cardenas to arrest Morales

at the time Cardenas announced his decision to arrest Morales.  Accordingly, the Court further

finds the Plaintiffs have sufficiently alleged facts showing that Cardenas violated Morales's

constitutional rights.

      B.    Clearly Established Right

Further, it was clearly established at the time of the incident that probable cause is required

for an arrest and that an arrest without probable cause violates the arrestee's constitutional rights.

"In suits alleging illegal arrest, the qualified immunity determination turns on whether a reasonable

officer could have believed [the arrest] to be lawful, in light of clearly established law and the

information the . . . officer[] possessed.  Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity."  *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994) (internal quotation marks and citation omitted) (alterations in original).  Therefore, "a qualified immunity defense cannot succeed where it is obvious that a reasonably competent officer would find no probable cause.  On the other hand, if officers of reasonable competence could disagree on this issue, immunity should be recognized."  *Id.* (internal quotation marks and citation omitted).

In his Motion, Cardenas only contends that there was probable cause to arrest Morales because he was taken before a magistrate for a probable cause hearing.  However, as addressed above, at this stage in the proceedings the Court must accept as true Morales's contention that he was never taken before a magistrate for a probable cause hearing.  Further, Cardenas identifies no facts in the Amended Complaint establishing probable cause existed to arrest Morales at the moment Cardenas "yell[ed] at [Morales] words to the effect that he was under arrest for causing a motor vehicle collision" and Guereca handcuffed Morales.  (ECF No. 11, p. 4).  Accordingly, the Court finds that when all facts alleged in the Amended Complaint are accepted as true, the Plaintiffs have overcome Cardenas's qualified immunity defense based upon adequately alleging the false arrest of Morales and the constitutionally guaranteed right to be free from false arrest which was clearly established at the time the arrest occurred.  Therefore, Cardenas's Motion should be denied.

### d.  **Gabriel Lechuga's Motion**

In his motion, Lechuga contends that the claim against him should be dismissed for three different reasons.  First, Lechuga contends that "dismissal is warranted based upon insufficient factual allegations."  (ECF No. 13, p. 4).  Second, Lechuga argues that "dismissal is warranted

based upon [a] lack of a cognizable legal theory." (*Id.* at 5).  Third, Lechuga asserts that "qualified

immunity warrants dismissal." (*Id.* at 6).

1.     Factual Allegations about the Conspiracy

Lechuga first asserts that Plaintiffs Amended Complaint "furnishes no clue as to which of

the named Defendants supposedly agreed to conspire, what they allegedly agreed to conspire to,

or when and where the alleged agreement took place.  As such, the [Amended] Complaint should

be dismissed as to Officer Lechuga." (*Id.*).  In their Response, Plaintiffs contend that they "initially

presented a case where multiple officers rallied behind a fellow officer . . . ." (ECF No. 48, p. 8).

However, in their discussion about how officers rallied around E. Carrillo, the only reference to

Lechuga is that Cardenas "entrusted Officer Lechuga to take Mr. Morales to the hospital for

'treatment.'" (*Id* at 9).  Further, in the discussion of Lechuga specifically, Plaintiffs do not identify

any actions taken by Lechuga that would infer his participation in a conspiracy.[23]

The  Court  finds  that  the  Plaintiffs  have  failed  to  allege  facts  showing  a  conspiracy

involving Lechuga.  "[C]onclusory allegations of conspiracy cannot, absent reference to material

facts, survive a motion to dismiss." *Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir. 1982).

Further, the facts supporting a conspiracy "when placed in a context . . . [must raise] a suggestion

of a preceding agreement, not merely parallel conduct that could just as well be independent

action." *Jabary v. City of Allen*, 547 F. App'x 600, 610 (5th Cir. 2013) (alterations in original,

internal quotation marks omitted).

First, there is no indication from the facts alleged in the Amended Complaint that Lechuga

had any communication with E. Carrillo.  However, Plaintiffs contend that it was E. Carrillo who

---

[23] The entire discussion section about Lechuga in the Response reads: "Officer Lechuga's motion is similarly deficient
in relying upon Mr. Morales' appearance before a Magistrate. As previously noted, that issue is disputed. After
Plaintiffs amended their pleadings, they found an absence of evidence where it ought to be, in the investigatory file."
(ECF No. 48, p. 12).

because of "his influence over his fellow officers, . . . was able to enlist successfully all of the other named individual Defendants to conspire . . . and agree among themselves to a course of action." (ECF No. 11, p. 12).  Further, there are only two alleged communications between Lechuga and the other officers.  Plaintiffs contend that Lechuga "was tasked to view the video surveillance tapes of the parking lot."  (*Id.* at 8).  However, the Amended Complaint contains no allegation about who tasked Lechuga with viewing the tapes nor that there were any other communications between Lechuga and other officers during that time.  Next, Plaintiffs contend that "Cardenas instructed Defendant Lechuga to take Mr. Morales to a Las Palmas medical facility so that they could take a look at [Morales's] chin, which was bleeding profusely."  (*Id.*).  Taking a person in police custody with visible injuries to receive medical treatment does not suggest the existence of an agreement to deprive that person of their constitutional rights.

None of the actions attributed to Lechuga imply an agreement and conspiracy to violate Morales's constitutional rights.  Plaintiffs contend that Lechuga did not retrieve the Video.  (*Id.* at 8).  However, there is no allegation that this was intentional or an attempt to cover-up exculpatory evidence.  Indeed, Plaintiffs have received and reviewed the Video.  (*Id.*).  The Plaintiffs also contend that on the way to the Las Palmas medical facility, "Lechuga struck up a conversation with Mr. Morales about his injuries and then, after supposedly detecting 'a strong odor of alcohol on [Morales's] breath,' . . . changed the subject to whether [Morales] had been drinking earlier in the day."  (*Id.*).  This ongoing questioning of Morales while transporting him to the hospital merely suggests independent action by Lechuga, not a preceding agreement and conspiracy.  Indeed, based upon the communications alleged to have occurred between Lechuga and other officers, there is no inference of a conspiracy.  Instead, the Plaintiffs have merely alleged that Lechuga was given instructions to investigate and transport a person with visible injuries to the hospital.  Therefore,

the Court finds that the Plaintiffs have failed to state a claim against Lechuga for a conspiracy to violate Morales's constitutional rights.

      2.      Cognizable Legal Theory

Construing count two of the Amended Complaint as a claim for false arrest, Lechuga argues that "the Amended Complaint should be dismissed." (ECF No. 13, p. 5). In support, Lechuga contends "there are no allegations that Officer Lechuga made the arrest." (*Id.*). Plaintiffs do not address this argument in their Response.

Plaintiffs fail to state a claim for false arrest against Lechuga. "Personal involvement is an essential element of a civil rights cause of action." *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983). The facts alleged in the Amended Complaint do not suggest that Lechuga participated in the arrest of Morales or in making the decision to arrest Morales.

First, the decision to arrest Morales was not made by Lechuga, it was made by Cardenas. (ECF No. 11, p. 10) ("Sgt. Cardenas announced *his* decision to arrest Mr. Morales.") (emphasis added). Second, Cardenas informed Morales that he was under arrest shortly after Cardenas arrived at Walmart. (*Id.* at 6). There is no allegation that Lechuga was present at the scene at that time. Nor are there allegations in the Amended Complaint that would suggest Lechuga was present. Third, Guereca was the officer who handcuffed Morales and seated him in the back of a police car. (*Id.*). Fourth, Lechuga was tasked by Cardenas with taking Morales, who was already in police custody at that time, to the Las Palmas medical facility. (*Id.* at 8). This occurred sometime after the arrest was made because Cardenas had time to speak to several bystanders and to Cardoza, and to turn EMS and Fire Department personnel away. (*Id.* at 7, 8). Finally, Plaintiffs do not allege that Lechuga spoke with anyone else about the video before Cardenas made his decision to arrest Morales, that the Video had any effect on the decision to arrest Morales, or that

Lechuga had any personal involvement in the decision to arrest Morales.  Instead, the Plaintiffs allege that Cardenas announced his decision to arrest Morales shortly after Cardenas arrived at the Walmart parking lot.  (*Id.* at 6).  Accepting each of the factual contentions as true, the Court finds that there are no factual allegations from which it could be inferred that Lechuga was personally involved in the arrest of Morales and that the Plaintiffs have failed to state a claim for false arrest against Lechuga.

3.      Qualified Immunity

Finally, Lechuga contends that "the conspiracy and/or false arrest claim should be dismissed based upon Officer Lechuga's qualified immunity."  (ECF No. 13, p. 6).

A.      Probable Cause for Arrest

First, Lechuga argues that "the existence of probable cause [for an arrest] defeats any false arrest claims as a matter of law."  (*Id.*) (citing *Wells v. Bonner*, 45 F.3d 90, 95 (5th Cir. 1995)). Lechuga contends that after the arrest, Morales "was taken before a magistrate judge for a probable cause hearing."  (*Id.*).  Lechuga asserts that based upon Fifth Circuit precedent, taking Morales before a magistrate judge for a probable cause hearing "'breaks the chain of causation, insulating the initiating party.'"  (*Id.*) (quoting *Cuadra v. Houston Ind. School Dist.*, 626 F.3d 808, 813 (5th Cir. 2010).

In their Response, Plaintiffs contend that it is disputed whether or not Morales was taken before a magistrate.  (ECF No. 48, p. 12).  In the Amended Complaint, Plaintiffs allege that Morales was not taken "before a magistrate for a probable cause hearing."  (ECF No. 11, p. 9). Accepting this assertion as true,[24] the Court finds that Lechuga's contrary contention that the false arrest claim must fail as a matter of law because Morales was taken before a magistrate judge for

---

[24] *Bell*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678.

a probable cause hearing cannot succeed.[25]   Accordingly, the Court finds that Lechuga cannot defeat the false arrest allegation by relying on his contention that Morales was taken before a magistrate.   However, as addressed above in Section III(d)(1), the Plaintiffs have failed to state a claim for false arrest against Lechuga because there is no allegation that Lechuga was personally involved in the decision to arrest or to effect the arrest of Morales.[26]

B.   Federal Rights

Next, Lechuga asserts that none of the acts attributed to him in the Amended Complaint violated Morales's constitutional rights.   (ECF No. 13, p. 7-8).   Lechuga contends that the only specific acts attributed to him in the Amended Complaint are: 1) "Lechuga was tasked to view the video surveillance tapes of the parking lot and that he did so with the Walmart manager;" 2) "[T]he manager advised Officer Lechuga that a copy of the recording would be made available on July 3, but that Lechuga allegedly did not return to pick up the video;" and 3) "[W]hile Officer Lechuga was driving the Plaintiff to the Las Palmas facility, he allegedly asked Mr. Morales whether he had been drinking earlier in the day without mirandizing Mr. Morales again."   (*Id.*).   In their Response, Plaintiffs do not dispute Lechuga's contention about Lechuga's actions during and after the incident at Walmart.[27]   *See* (ECF No. 48, p. 12).

Lechuga contends that his handling of the Video is not "evidence of any constitutional tort or violation of civil rights."   (ECF no. 13, p. 7).   The Plaintiffs do not address this contention in

---

[25] When considering the instant motions, the Court must accept as true Morales's contention that he was not taken before a magistrate for a probable cause hearing.   *See Bell*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678.   Factual development of the claim may, of course, alter the analysis during later proceedings.

[26] Plaintiffs are very clear in their Amended Complaint that it was "Officers Carzoli and Ferrel [who] violated [Morales's] rights under the Texas Code of Criminal Procedure by not taking [Morales] before a magistrate for a probable cause hearing."   (ECF No. 11, p. 9).   Accordingly, the Court will address this specific allegation in the discussion of Carzoli and Ferrel.

[27] The entire discussion section about Lechuga in the Response reads: "Officer Lechuga's motion is similarly deficient in relying upon Mr. Morales' appearance before a Magistrate. As previously noted, that issue is disputed. After Plaintiffs amended their pleadings, they found an absence of evidence where it ought to be, in the investigatory file." (ECF No. 48, p. 12).

their Response.  The Plaintiffs provide no argument or authority for the proposition that Lechuga's handling of the Video violated a statutory or constitutional right.  Further, Plaintiffs do not identify which of Morales's constitutional rights were violated by Lechuga's handling of the Video. Finally, even if the retrieval of the Video from Walmart was delayed, the Plaintiffs acknowledge in their Amended Complaint that they have now obtained and viewed the Video.  (ECF No. 11, p. 8).  Accordingly, the Court finds that Plaintiffs have failed to allege the actions attributed to Lechuga in his handling of the Video deprived any of the Plaintiffs of their constitutional rights.

Lechuga further contends that "there is no allegation that Mr. Morales was never provided with *Miranda* rights, only that Officer Lechuga did not do so."  (ECF No. 13, p. 8).  Further, even if Morales was not informed of his *Miranda* rights, the "remedy for such an error would be that the prosecutor could not use the purported confession and not a constitutional tort."  (*Id.*).  Other than reiterating their contention that Lechuga did not "give [Morales] a Miranda warning" the Plaintiffs do not address Lechuga's argument in their Response.  (ECF No. 48, p. 5).

Accepting as true the contention that Lechuga did not inform Morales of his *Miranda* rights,[28] and assuming *arguendo* that no other officer informed Morales of those rights prior to the conversation with Lechuga, Plaintiffs fail to plead facts showing that Lechuga "violated a statutory or constitutional right . . ." as required to overcome Lechuga's defense of qualified immunity. *Jackson*, 959 F.3d at 200.  "The Fifth Amendment privilege against self-incrimination is a fundamental trial right which can be violated only *at* trial, even though pre-trial conduct by law enforcement officials may ultimately impair that right."  *Murray v. Earle*, 405 F.3d 278, 285 (5th Cir. 2005) (emphasis in original).  Plaintiffs do not contend in their Amended Complaint that the statement, allegedly obtained without Lechuga informing Morales of his *Miranda* rights, was ever

---

[28] *Bell*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678.

used against Morales *at trial*.  If the statement was made without Morales being informed of his Miranda rights and is used against him at trial, the "pre-trial conduct by law enforcement officials may ultimately impair" his constitutional rights.  *Murray*, 405 F.3d at 285; *see Clark v. City of San Antonio*, No. 5:16-CV-797-DAE, 2016 WL 10589878, at *3 (W.D. Tex. Nov. 30, 2016) ("Plaintiff has not alleged that any statement he made during questioning has been used against him at trial. The Court finds that Plaintiff cannot assert a § 1983 claim based on the failure to administer Miranda warnings, and this claim will be DISMISSED WITHOUT PREJUDICE.") (emphasis in original).  However, as there is no allegation that the statement has been used against Morales at trial, the Court finds that the Plaintiffs have failed to plead a violation of Morales's constitutional rights based upon Lechuga's conduct during the drive to the Las Palmas medical facility.

"The Supreme Court has warned against vague or general assertions of constitutional rights and has required a § 1983 plaintiff to state with specificity the constitutional right that has been allegedly violated—otherwise, liability could be imposed in every case."  *Sanchez v. Swyden*, 139 F.3d 464, 466–67 (5th Cir. 1998).  In this case, Plaintiffs do not identify what constitutional right was violated by Lechuga.  Plaintiffs make a generalized claim against the Defendants relating to a conspiracy to deprive Morales of his constitutional rights.  *See* (ECF No. 11, p. 12).  However, the Court finds that none of the specific actions attributed to Lechuga are alleged to have violated any of the Plaintiffs' constitutional rights.  Accordingly, the Court finds that the Plaintiffs have failed to state a claim against Lechuga for Claim Two of the Amended Complaint.[29]

---

[29] Claim Two of the Amended Complaint appears to be the only claim raised against Lechuga.

> **e.**      **Carzoli's Motion and Ferrel's Motion**[30]

In their Motions, Carzoli and Ferrel contend that they are entitled to qualified immunity. (ECF No. 39, p. 7); (ECF No. 40, p. 6).  First, Carzoli and Ferrel contend that the Plaintiffs have "provided no factual detail to show that [Carzoli and Ferrel] acted in any way to effect the imposition of false charges, or perjured testimony." (*Id.* at 8).  Then Carzoli and Ferrel argue that Plaintiffs have failed to allege a conspiracy against them.  (ECF No. 39, p. 9); (ECF No. 40, p. 9).

> **1.**      Acts Attributed to Carzoli and Ferrel

In their Amended Complaint, the Plaintiffs attribute five specific acts to Carzoli and Ferrel: 1) "After Mr. Morales' blood was drawn, . . . Miguel Carzoli and Juan Ferrel arrived at the hospital"; 2) Carzoli and Ferrel "took over from Officer Lechuga"; 3) Carzoli and Ferrel "retrieved the bag with the blood the nurse had drawn"; 4) Carzoli and Ferrel "walked out without saying anything to Mr. Morales"; and 5) Carzoli and Ferrel "made false statements that they had obtained Mr. Morales' consent and had been present during the blood draw."  (ECF No. 11, p. 9).  The Plaintiffs further contend that "[a]fter violating [Morales's] Constitutional rights [by taking his blood without consent], Officers Carzoli and Ferrel violated his rights under the Texas Code of Criminal Procedure by not taking him before a magistrate for a probable cause hearing." (*Id.* at 9).

Carzoli and Ferrel contend that Plaintiffs are not making a claim against them for not taking Morales before a magistrate for a probable cause hearing after his arrest.  (ECF No. 39, p. 3); (ECF No. 40, p. 3).  However, the Plaintiffs specifically allege in their Amended Complaint that Morales's rights were violated because Carzoli and Ferrel did not take him before a magistrate.

---

[30] All actions attributed to Carzoli are also attributed to Ferrel.  Further, Carzoli's Motion and Ferrel's Motion are functionally identical, alleging the same facts and making the same legal arguments.  The Court will therefore address Carzoli and Ferrel collectively.

Even though the Plaintiffs contend that Ferrel and Carzoli failed to take Morales before a magistrate for a probable cause hearing as required by Texas law, the Court finds that the Plaintiffs have not alleged a violation of Morales's federal rights as required under section 1983. Texas Code of Criminal Procedure Article 15.17 directs that "the person making the arrest or the person having custody of the person arrested shall . . . take the person arrested or have him taken before some magistrate . . . ." However, Title 42 U.S.C. "Section 1983 provides a federal remedy for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws. As the language of the statute plainly indicates, the remedy encompasses violations of federal statutory as well as constitutional rights." *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 105 (1989) (internal quotation marks omitted). "A determination that § 1983 is available to remedy a statutory or constitutional violation involves a two-step inquiry. First, the plaintiff must assert the violation of a *federal right*." *Id.* (emphasis added). "Second, even when the plaintiff has asserted a federal right, the defendant may show that Congress specifically foreclosed a remedy under § 1983." *Id.* (internal quotation marks omitted).

In this case, the Plaintiffs are contending that Carzoli and Ferrel "violated [Morales's] rights under the Texas Code of Criminal Procedure by not taking him before a magistrate for a probable cause hearing." (ECF No. 11, p. 9). The contention that Morales was not taken before a magistrate, in violation of the Texas Code of Criminal Procedure, does not constitute an allegation that Morales's federal rights have been violated. Further, it is unclear why Plaintiffs contend that Carzoli and Ferrel were the officers responsible for taking Morales before the magistrate when Plaintiffs allege in their Amended Complaint that Carzoli and Ferrel retrieved the bag of blood and left without ever communicating with Morales. (*Id.*).

The Plaintiffs also contend that Carzoli and Ferrel violated Morales's constitutional rights through the unconstitutional blood draw.  (*Id.*).  In support of this contention, the Plaintiffs allege in their Amended Complaint that "the officer who retrieved the blood sample was either Defendant Ferrel or Defendant Carzoli."  (ECF No. 11, p. 9).  The Plaintiffs further contend that "Defendants Carzoli and Ferrel later made false statements that they had obtained Mr. Morales' consent and had been present during the blood draw."  (*Id.*).  The Plaintiffs also allege that "[a] person or persons unknown forged [Morales's] signature to a consent form.  (*Id.*).  However, this allegation does not identify which person or persons the Plaintiffs are contending forged Morales's signature. The Plaintiffs are very clear in their Amended Complaint that it was "[a] nurse [who] drew blood from Mr. Morales, assuming the patient's permission for purposes of medical treatment."  (*Id.*). Further, it was only "[a]fter Mr. Morales' blood was drawn [that] Defendants and El Paso Police Officers Miguel Carzoli and Juan Ferrel arrived at the hospital . . . and retrieved the bag with the blood the nurse had drawn."  (*Id.*).  The Plaintiffs contend that "Carzoli and Ferrel *later* made false statements that they had obtained Mr. Morales' consent and had been present during the blood draw."  (*Id.*) (emphasis added).  There is no contention that any police officer directed the nurse to draw Morales's blood.  Further, even if Ferrel and Carzoli subsequently stated that they had obtained Morales's consent to the blood draw as alleged by the Plaintiffs, there is no contention that they did anything more at the Las Palmas facility than retrieve the blood after the nurse had already drawn it from Morales.  Finally, the Plaintiffs do not contend that Ferrel or Carzoli even knew the status of Morales's consent at the time they retrieved the blood from the Las Palmas facility.

Accepting the well-pleaded facts in the Amended Complaint as true, the Court finds that Carzoli and Ferrel are entitled to qualified immunity for the actions attributed to them in the

Amended Complaint.  "In 1966 the Supreme Court recognized that the exigent-circumstances exception to the Fourth Amendment permitted police officers to order a warrantless blood draw from a conscious driver involved in an accident."  *Stewart v. Parkview Hosp.*, 940 F.3d 1013, 1016 (7th Cir. 2019) (citing *Schmerber v. California*, 384 U.S. 757, 758–59, 766–72 (1966)).   In *Stewart*, the Seventh Circuit addressed a situation where "[t]he police requested and received the blood-test results from the hospital's medical staff."  *Id.* at 1014.  The *Stewart* Court concluded that they had "identified no case law establishing that an officer's receipt of blood-test results from medical personnel offends the Fourth Amendment."  *Id.* at 1016.  The *Stewart* Court then held that the plaintiff failed to "establish that the officers violated a right clearly established under the Fourth Amendment, and qualified immunity applies."  *Id.*

In *Dodd v. Jones*, the Eighth Circuit addressed a situation where the plaintiff alleged that his Fourth Amendment rights were violated because a blood sample was not tested to determine its blood alcohol until nearly a month after his arrest and the blood draw.  623 F.3d 563 (8th Cir. 2010).  The Court in *Dodd* recognized that because "the percentage of alcohol in the blood diminishes with time, an effort to secure evidence of blood-alcohol content by drawing blood from a suspect after his arrest is a reasonable search incident to arrest."  *Id.* at 568 (citing *Schmerber*, 384 U.S. at 770–71).  The *Dodd* Court concluded "that the taking and later analysis of the blood are a single event for fourth amendment purposes, and . . . a search is completed upon the drawing of the blood."  *Id.* at 569 (internal citations and quotation marks omitted).

In this case, the Plaintiffs allege that a nurse drew Morales's blood.  (ECF No. 11, p. 9).  Assuming that the blood draw was done in violation of the Fourth Amendment, the Plaintiffs contend that Carzoli and Ferrel arrived at the hospital and retrieved the blood "[a]fter Mr. Morales' blood was drawn."  (*Id.*).  Accordingly, the "search" was completed before Carzoli and Ferrel

became involved.  Even accepting Morales's contention that he did not consent to having his blood

drawn, the Plaintiffs do not identify any person other than the nurse as being involved in the blood

draw.  Therefore, the Court finds that the Plaintiffs have failed to allege that the subsequent

retrieval of the blood by Carzoli and Ferrel violated any of Morales's federal rights.

The Plaintiffs also contend that "Carzoli and Ferrel later made false statements that they

had obtained Mr. Morales' consent and had been present during the blood draw."  (ECF No. 11,

p. 9).  Construing this as an attempt by the Plaintiffs to implicate Carzoli and Ferrel in the alleged

forgery of Morales's signature, the Court finds that Plaintiffs have failed to allege a violation of

Morales's constitutional rights.  First, Plaintiffs do not allege who forged Morales's signature.

Further, in *O'Con v. Katavich*, the district court addressed a situation where the plaintiff claimed

"she was subjected to a strip search without a warrant and without probable cause. Plaintiff also

allege[d] Defendants did not inform her that she could refuse to consent to the strip search and she

never consented to a search, but the officers forged her signature on a consent form."  No. 1:13-

CV-1321-AWI-SKO, 2013 WL 6185212, at *5 (E.D. Cal. Nov. 26, 2013).  The Court found that

the "Plaintiff ha[d] not alleged how the forgery itself [was] a constitutional violation."  *Id.* at *8.

The Court reasoned that:

> If officials were authorized to strip search Plaintiff without her consent, then any
> alleged forged consent to search or conspiracy to do so, from a constitutional
> perspective, is irrelevant.  If the officers were not authorized to search without
> Plaintiff's consent, then a forged consent renders the search unconstitutional.  Thus,
> a forged consent form does not implicate Plaintiff's constitutional rights in and of
> itself, but the alleged forged consent to search and the conspiracy to forge Plaintiff's
> consent is relevant to the constitutionality of the strip search.

*Id.*  Just as in *Katavich*, the alleged forgery of the consent form and the subsequent false statements

attributed to Carzoli and Ferrel implicate the constitutionality of the blood draw and not Morales's

constitutional rights.  As addressed above, based upon the facts alleged in the Amended Complaint,

the search was completed before Carzoli and Ferrel became involved.  Further, it is not clear when the allegedly false statements were made and there is no allegation that those false statements were used against Morales or had any impact on the criminal proceedings against him.  Finally, it is unclear what deprivation of a federal right enjoyed by Morales occurred based upon the specific acts of the alleged forgery and the false statements attributed to Ferrel and Carzoli.

Accordingly, the Court finds that through the specific acts attributed to Ferrel and Carzoli in the Amended Complaint, the Plaintiffs fail to allege a violation of a federally protected right that was clearly established.

2.      Conspiracy

The Plaintiffs have failed to allege a conspiracy involving Ferrel and Carzoli to deprive Morales of his constitutional rights.  First, just as with Lechuga, there is no allegation that Ferrel and Carzoli had any communication with E. Carrillo, the person allegedly responsible for the conspiracy who used "his influence over his fellow officers, . . . [and] was able to enlist successfully all of the other named individual Defendants to conspire . . . and agree among themselves to a course of action."  (ECF No. 11, p. 12).  Second, as addressed above in Section III(e)(1), the allegedly nonconsensual blood draw in violation of the Fourth Amendment from Morales was completed before Ferrel and Carzoli arrived at the hospital.  (*Id.* at 9).  The Plaintiffs only allege that Ferrel and Carzoli retrieved the bag of blood and not that they were present during the blood draw or that they played an active role in the blood draw.  (*Id.*).

The Plaintiffs also allege that Ferrel and Carzoli made false statements about obtaining Morales's consent for the blood draw and being present when it occurred.  (*Id.*).  However, Plaintiffs do not allege in what context these statements were made.  Further, there is no allegation that those statements were made at the direction of E. Carrillo or in furtherance of any goal of a

conspiracy.  Accordingly, the Court finds that the Plaintiffs have failed to allege any facts from which the inference of a conspiracy involving Ferrel and Carzoli to violate Morales's constitutional rights can be drawn.  Therefore, the Court finds that Plaintiffs have failed to state a claim against Ferrel and Carzoli for Claim Two of the Amended Complaint, Imposition of False Charges, Plus Perjured Testimony.[31]

### f.    The City Defendants' Motion

The City Defendants argue that all claims against them should be dismissed for failing to state a claim for municipal liability.  (ECF No. 17, p. 1).  Further, the City Defendants assert that the EPPD should be dismissed as a defendant for a lack of personal jurisdiction.  (*Id.* at 2-3).

### 1.    Defendant El Paso Police Department

The City Defendants argue that EPPD should be dismissed for a lack of personal jurisdiction since EPPD "is a department of the City of El Paso, [and] it does not have a jural existence.  The EPPD cannot be served with process or sued."  (ECF No. 17, p. 2).  The City Defendants request that "in the interest of avoiding confusion . . . EPPD be struck from the pleadings as a Defendant."  (*Id.* at 3).  The Plaintiffs do not address this argument in their Response.

The Plaintiffs have failed to establish that EPPD enjoys a separate, legal existence from the City of El Paso and, therefore, EPPD cannot be separately sued.  "The capacity of an entity to sue or be sued 'shall be determined by the law of the state in which the district court is held.'"  *Darby v. Pasadena Police Dep't*, 939 F.2d 311, 313 (5th Cir. 1991) (quoting Fed. R. Civ. P. 17(b)).  "In order for a plaintiff to sue a city department, it must enjoy a separate legal existence."  *Id.* (internal quotation marks omitted).  Further, "unless the true political entity has taken explicit steps to grant the servient agency with jural authority, the agency cannot engage in any litigation except

---

[31] Claim Two of the Amended Complaint appears to be the only claim raised against Carzoli and Ferrel.

in concert with the government itself." *Id.* Finally, "[t]he plaintiff has the burden of showing that the city department has the capacity to be sued." *Pueblo v. City of El Paso*, No. EP-17-CV-00162-DCG, 2018 WL 7133707, at *2 (W.D. Tex. Mar. 22, 2018) (citing *Darby*, 939 F.2d at 314).

In *Kirkendall v. Grambling & Mounce, Inc*, the "district court . . . concluded that the El Paso Police Department was not subject to suit . . . because it did not have a separate legal existence from the municipality itself." 4 F.3d 989, 1993 WL 360732, at *3 (5th Cir. Aug. 23, 1993). Further, the plaintiff "d[id] not suggest that the police department [was] a legal entity separate from the City of El Paso." *Id.* The Fifth Circuit "affirm[ed] the dismissal of the El Paso Police Department from the suit because there ha[d] been no showing that the department ha[d] a legal existence separate from the City of El Paso." *Id.*

In this case, the Plaintiffs have not alleged and have not shown that the EPPD has a legal existence separate and apart from the City of El Paso. Further, the Plaintiffs have not alleged and have failed to show that the City of El Paso has taken any steps to grant the EPPD jural authority. Therefore, the Court finds EPPD should be dismissed from this suit, thereby leaving the City of El Paso itself and EPPD Police Chief Greg Allen, in his official capacity, as the remaining City Defendants.

2.      Claim Against the City Defendants

In their Motion, the City Defendants contend that "Plaintiff[s] ha[ve] identified no policy or custom, but nebulously cite[] to a 'code of silence', a conclusory allegation based on a myriad of unwarranted deductions." (ECF No. 17, p. 6). Further, "Plaintiff does not show how this vague 'code of silence' was either promulgated by a policy maker, or was the moving force behind [Morales's] alleged injury." (*Id.*).

A.      Proper Pleading Standard

In their Response, the Plaintiffs contend that in the context of a municipal liability claim, "they do not need to specifically state what the policy is and instead may rely on minimal factual allegations."  (ECF No. 48, p. 7) (emphasis and internal quotation marks omitted).

The Fifth Circuit recently stated that in the context of claims for municipal liability, "the ordinary *Twombly* pleading standard applies."  *Ratliff v. Aransas Cty.*, 948 F.3d 281, 284 (5th Cir. 2020).  Accordingly, in order for the Plaintiffs' claim for municipal liability "[t]o survive a motion to dismiss, . . . [their] *Monell* pleadings must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Id.* at 284-85.  Accordingly, to successfully state a claim against the City Defendants, the Plaintiffs must satisfy the *Twombly* pleading standard.

B.      Policy or Custom

In their Amended Complaint, the Plaintiffs allege that the EPPD has a "code of silence" that tolerated and allowed for misconduct to be committed.  In *Kinney v. Weaver*, the Fifth Circuit observed that "[t]he so-called 'code of silence,' . . . is the informal rule according to which one police officer does not report on or testify against another police officer, regardless of the nature of the accused officer's conduct."  367 F.3d 337, 366, n.32 (5th Cir. 2004).

The Plaintiffs allege that the facts contained in their Amended Complaint "strongly suggest that a code of silence was well established in the El Paso Police Department when the Carrillos beat Mr. Morales into submission."  (ECF No. 11, p. 13).  Further, the Plaintiffs allege "that a police officers' Code of Silence, with toleration of misconduct, is a widespread practice that is so common and well settled as to constitute a custom that fairly represent municipal policy [and t]hat policy was the moving force behind . . . the resulting damages [Morales] . . . sustained . . . ." (*Id.*

at 13-14).  In support of their contention that this custom exists, the Plaintiffs allege that all but one of the officers "rallied around the Carrillos [with] scant concern for Mr. Morales' injuries . . . ."  (*Id.* at 13).  Additionally, no officers were disciplined following the incident at Walmart.  (*Id.*).  Further, after Morales's acquittal on the assault charge, he was indicted for felony DWI.  (*Id.*).  Finally, "Enrique Carrillo has a record of complaints against him which should have resulted in termination of his employment, but has not.  Instead, Officer Carrillo holds a desk job as a public spokesman for the Department."  (*Id.*).

The Court finds that none of the facts alleged are sufficient to establish that there was a policy or custom within the EPPD that was the moving force for the injuries alleged by the Plaintiffs, as required for municipal liability.  *See Piotrowski*, 237 F.3d at 581 (5th Cir. 2001) ("The reason the policies or customs must be disaggregated should be clear.  Taken together, they express no single municipal policy but only a series of adversarial conclusions by [the plaintiff] . . . relating to her individual case.") .

First, the Court finds that the Plaintiffs' contention that the indictment of Morales for DWI, following his acquittal on the assault charge, does not support a conclusion that there was a custom or policy within the EPPD.  The Plaintiffs fail to allege facts sufficient to establish a pattern or practice of prosecuting persons involved in physical altercations with police in furtherance of a code of silence.  "For a custom or practice to be considered a de facto policy, however, a plaintiff must allege facts 'showing a pattern of abuses that transcends the error made in a single case.'" *Lozano v. Ortega*, No. EP-14-CV-239-KC, 2014 WL 6611595, at *15 (W.D. Tex. Nov. 19, 2014) (quoting *Piotrowski*, 237 F.3d at 582).  The Plaintiffs have failed to connect the indictment of Morales with a larger pattern of abuses that would be emblematic of a custom or policy.  Assuming *arguendo* that the subsequent indictment of Morales was a constitutional violation, "[a] customary

municipal policy cannot ordinarily be inferred from single constitutional violations." *Piotrowski*, 237 F.3d at 581 (5th Cir. 2001).

In further support of their contention that there is a custom which tolerates misconduct within the EPPD, the Plaintiffs allege that the other officers rallied around E. Carrillo and that none of the officers involved with the incident in the Walmart parking lot were disciplined.  First, the Plaintiffs have failed to allege facts involving the other officers, outside of the incident at Walmart, that would support a code of silence.   In *Ratliff*, the Fifth Circuit affirmed the dismissal of a municipal liability claim against a police department where the district court found that the plaintiff failed to establish a custom or policy because the only specific facts alleged were related to the incident giving rise to the plaintiffs claim for excessive force.  948 F.3d at 285.  Here, the only facts the Plaintiffs allege with any specificity relate to the incident at Walmart and the Plaintiffs' injuries alleged to have resulted from what occurred during and after the incident at Walmart.  The Plaintiffs fail to allege any facts about EPPD police officers rallying around other police officers during other officer involved incidents.

In their Response, the Plaintiffs contend that "[t]he problem of police officers' willingness to support one another over members of the public whom they are charged to protect and serve, has received widespread attention."  (ECF No. 48, p. 8).  The Plaintiffs appear to suggest that the inference that should be drawn from this contention of misconduct occurring nationally applies with equal force to the conduct of officers within the EPPD.  However, the Plaintiffs fail to allege a pattern or practice within the EPPD which tolerates excessive force or other misconduct by officers because they allege no facts beyond what occurred at Walmart.  The generalized assertion that police officer misconduct exists nationally is insufficient for Plaintiffs' claim against the City

Defendants as the Amended Complaint only contains specific allegations about this single incident at Walmart and not a widespread pattern within the EPPD.

The Plaintiffs' allegation that no police officers were disciplined after the incident is insufficient to establish a policy or custom. Even if the actions of the other defendants were unlawful at the time they occurred, "a policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality." *Peterson*, 588 F.3d at 848 (citing *Coon v. Ledbetter*, 780 F.2d 1158, 1161–62 (5th Cir. 1986)). In this case, the Plaintiffs are alleging that a code of silence exists within the EPPD which was the moving force of the Plaintiffs' injuries alleged in the Amended Complaint. However, the Plaintiffs have failed to allege how a lack of disciplinary action for the incident in the Walmart parking lot demonstrates a custom so widespread that it can be considered a policy. *See Lozano*, 2014 WL 6611595, at *15 ("For a custom or practice to be considered a de facto policy, however, a plaintiff must allege facts showing a pattern of abuses that transcends the error made in a single case.") (internal quotation marks omitted).

Finally, in support of their contention that a code of silence exists within the EPPD, the Plaintiffs allege that "Enrique Carrillo has a record of complaints against him which should have resulted in termination of his employment, but has not." (ECF No. 11, p. 13). However, the Plaintiffs have failed to allege facts to support their generalized conclusion that E. Carrillo should have been terminated. "A pattern requires similarity and specificity; prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Peterson*, 588 F.3d at 851 (internal quotation marks and alteration omitted). In their Amended Complaint, Plaintiffs merely allege that E. Carrillo has had complaints filed against him that should have resulted in his termination. The Plaintiffs have not alleged any facts connecting

the complaints to a code of silence.  Further, the Plaintiffs have not identified what type of complaints have been filed against E. Carrillo, how those complaints are in any way similar to or connected with the incident at Walmart, or how those complaints demonstrate such a widespread acceptance of misconduct that it can be considered a de facto policy.  This conclusory allegation that E. Carrillo should have been terminated from his employment with the EPPD is not supported by any factual allegations contained in the Amended Complaint.  Moreover, the Plaintiffs have not alleged a pattern of misconduct by E. Carrillo, any of the other Defendants, or any EPPD officers.

Accordingly, the Court finds that the Plaintiffs have failed to allege a custom or policy of officer misconduct by the Defendants or within the EPPD that would support their claim for municipal liability based upon a code of silence.

Plaintiffs also cite to *Sanchez v. Gomez* in support of their claim for municipal liability. 283 F. Supp. 3d 524 (W.D. Tex. 2017).  In *Sanchez*, the plaintiffs alleged that the EPPD had a custom of using excessive force against mentally ill victims.  *Id.* at 535. The *Sanchez* plaintiffs provided numerous statistics and described many specific instances where excessive force had allegedly been used against mentally ill individuals.  *Id.* In contrast, the Plaintiffs in this case provide no factual allegations, other than the facts of the incident at Walmart, to support their claim for municipal liability.

To establish a policy or custom, Plaintiffs attempt to rely on generalized assertions and conclusory statements.  This is insufficient as "[a] pattern requires similarity and specificity."  *Id.* at 536.   In *Peña*, the Fifth Circuit held that to "plausibly . . . plead a practice 'so persistent and widespread as to practically have the force of law,'. . . a plaintiff must do more than describe the incident that gave rise to his injury." *Peña*, 879 F.3d at 622 (5th Cir. 2018) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).  In *Snyder v. Trepagnier*, the Fifth Circuit held that the

plaintiff's reference to a single incident six years prior was insufficient to establish a code of silence "particularly given the absence of evidence suggesting a culture of recklessness." 142 F.3d 791, 798 (5th Cir. 1998).

In this case, the Plaintiffs allege no specific facts or incidents, other than in relation to the incident at Walmart, in support of their contention that a code of silence exists within the EPPD that was the moving force of their injuries. As the Plaintiffs have failed to do more than describe the incidents giving rise to their alleged injuries, the Court finds that the Plaintiffs have failed to state a claim for municipal liability against the City Defendants. Accordingly, the Court finds that the Plaintiffs have failed to state a claim for municipal liability against the City Defendants.

C.      Respondeat Superior

The City Defendants further contend that "respondeat superior does not operate to subject the City or the Chief to liability." (ECF No. 17, p. 9). The Plaintiffs do not respond to this argument.

As addressed above, municipalities cannot be held liable under 42 U.S.C. § 1983 based upon a theory of vicarious liability. *Monell*, 436 U.S. at 694. Accordingly, as there are no factual claims against the City Defendants being personally involved in the incident at Walmart, Claim One Excessive Force During Arrest, Claim Two Imposition of False Charges, Plus Perjured Testimony, Claim Three Texas Common Law Infliction of Bodily Injury, and Claim Four Texas Common Law Bystander Claim of the Amended Complaint are inapplicable to the City Defendants. Therefore, the Court finds that the Plaintiffs cannot state a claim against the City Defendants for claims one through four of the Amended Complaint.

### D.      Qualified Immunity

Finally, the City Defendants argue that "[i]f the plaintiff[s] cannot pierce the Qualified Immunity of the Defendant officers, [they] cannot state a viable § 1983 claim against the City or the Chief."  (ECF No. 17, p. 11).  The Plaintiffs do not respond to this argument.

As addressed above, the Court has found that the Plaintiffs have alleged sufficient facts to overcome E. Carrillo's and Cardenas's defense of qualified immunity at this stage of the proceedings.  However, because the Plaintiffs have failed to allege a policy or custom that was the moving force of their alleged injuries, the Court finds that the Plaintiffs have failed to state a claim for municipal liability against the City Defendants.

## IV.   CONCLUSION

For the foregoing reasons, the Court finds that the Plaintiffs have stated a claim for excessive force against Defendant E. Carrillo and Defendant A. Carrillo.  The Court further finds that Plaintiffs have alleged sufficient facts, accepted as true, from which it can be inferred that a conspiracy existed between Defendants E. Carrillo, A. Carrillo, and Cardenas.  The Court also finds that Plaintiffs have failed to state a claim against Defendants Lechuga, Ferrel, and Carzoli. Additionally, the Court finds that Defendant EPPD cannot be sued because it is an instrumentality of the City of El Paso.  Finally, the Court finds that Plaintiffs have failed to state a claim for municipal liability against the City Defendants.

Accordingly, the Court **RECOMMENDS** that:

- "Defendant Sergeant Gabriel Lechuga's Rule 12(b)(6) Motion to Dismiss" (ECF No. 13) be **GRANTED**;

- "Defendant Sergeant Ruben Cardenas' Rule 12(b)(6) Motion to Dismiss" (ECF No. 14) be **DENIED**;

- "Defendant Sergeant Enrique Carrillo's Rule 12(b)(6) Motion to Dismiss (ECF No. 15) be **DENIED**;

- "Defendant Aaron Carrillo's Rule 12(b)(6) Motion to Dismiss" (ECF No. 16) be **DENIED**;

- "City of El Paso's Rule 12 Motions to Dismiss and Brief in Support" (ECF No. 17) be **GRANTED**;

- "Defendant Officer Miguel Carzoli's Rule 12(b)(6) Motion to Dismiss Plaintiffs' Amended Complaint and Demand for Jury Trial" (ECF No. 39) be **GRANTED**; and

- "Defendant Officer Juan Ferrel's Rule 12(b)(6) Motion to Dismiss Plaintiffs' Amended Complaint and Demand for Jury Trial" (ECF No. 40) be **GRANTED**.

**SIGNED** and **ENTERED** this 6th day of July, 2020.

**ANNE T. BERTON**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THE FOREGOING REPORT, WITHIN FOURTEEN DAYS OF SERVICE OF SAME, MAY BAR DE NOVO DETERMINATION BY THE DISTRICT JUDGE OF AN ISSUE COVERED HEREIN AND SHALL BAR APPELLATE REVIEW, EXCEPT UPON GROUNDS OF PLAIN ERROR, OF ANY UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS AS MAY BE ACCEPTED OR ADOPTED BY THE DISTRICT COURT.**